UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                   :

THE ANNUITY, PENSION, WELFARE AND    :
APPRENTICESHIP SKILL IMPROVEMENT &   :
SAFETY FUNDS OF THE INTERNATIONAL   :
UNION OF OPERATING ENGINEERS, LOCAL :
137, 137A, 137B, 137C & 137R, AFL-CIO, BY   :
ITS TRUSTEES ALBERT J. GIRARDI, JR.,    :
EDWARD KELLY, JEFFREY LOUGHLIN,     :
PETER PATERNO, ROSS PEPE AND        :              11-cv-00178 (NSR)
NICHOLAS SIGNORELLI, JR.,           :             OPINION & ORDER
                                   :
               Plaintiffs,       :
v.                                 :
                                 :
COLONIAL SURETY COMPANY,        :
                                 :
              Defendant.      :
--------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

      This case was brought by the Annuity, Pension, Welfare and Apprenticeship Skill

Improvement & Safety Funds (the "Funds") of the International Union of Operating Engineers,

Local 137, 137A, 137B, 137C & 137R, AFL-CIO (the "Union" or "Local 137") by its Trustees

(together, "Plaintiffs") to recover contributions in connection with a collective bargaining

agreement between DeRosa Tennis Contractors, Inc ("DeRosa Tennis") and the Union. Plaintiffs

also named DeRosa Sports Construction, Inc. as a defendant. On April 9, 2014, Plaintiffs entered

into a stipulation to dismiss DeRosa Sports Construction, Inc. from the case. On June 3, 2014,

Plaintiffs entered into a consent judgment as to DeRosa Tennis Contractors, Inc. The only

remaining Defendant is Colonial Surety Company. Before the Court is Colonial Surety

Company's motion for partial summary judgment. For the following reasons, Defendant's

motion is DENIED.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/11/2014

I.       **Background**

On March 3, 2008,[1] DeRosa Tennis entered into a collective bargaining agreement (the

"CBA") with the International Union of Operating Engineers Local 137, 137A, 137B, 137C and

137R, AFL-CIO and the Local 137 Annuity, Pension, Welfare and Apprenticeship Skill

Improvement & Safety Funds. Plaintiffs' Statement of Material Facts Pursuant to Local Rule

56.1 ("Pl.'s 56.1") ¶ 4. As stated in the preamble, the CBA was entered into between the parties

"for the purpose of establishing the wages, hours and conditions of employees represented by the

[International Union of Operating Engineers Local 137, 137A, 137B, 137C and 137R, AFL-

CIO], and employed by Employees subject to this Contract." CBA, preamble. The CBA provides

that "[w]ages shall be paid weekly in currency . . . on the job where Employees covered by this

Agreement are employed at least one (1) hour . . . in accordance with the weekly rates itemized

on the schedule attached [to the CBA] and made a part of this Agreement." CBA Art. IX, s. 1.

Additionally, the CBA provides for contributions to the Funds as follows: "It is hereby mutually

understood and agreed that commencing March 3rd, 2008 the Employer shall contribute as

agreed and allocated as set forth hereinafter on the Fringe Benefit Schedule of this Agreement.

Contributions shall be on all hours paid. Check in payment of said contributions shall be made

payable to Local 137 Joint Funds account and shall be delivered to each Employee weekly,

simultaneously with payment of wages." CBA Art. X, s. 1(a). The same language is repeated for

the Pension Fund and the Apprenticeship, Skill Improvement and Safety Fund. CBA Arts. XI, s.

1 & XII, s. 1.

---

[1] Colonial Surety's 56.1 Statement states that the CBA was entered into on March 3, 2010. However, the copy of the CBA provided by both Plaintiff (Russo Affirmation Ex. A) and Colonial Surety (Delaney Affirmation Ex. C) state the date of the document at March 3, 2008.

Colonial Surety subsequently issued three bonds as surety on behalf of DeRosa Tennis, as principal. The first was issued on November 2, 2009 in favor of the City of Yonkers, as obligee, in connection with a project known as the Pelton Park Project. Defendant Colonial's Statement of Material Facts Pursuant to Local Rule 56.1 ("Colonial's 56.1") ¶ 2. The second was issued on March 9, 2010 in favor of the City of New York, as obligee, in connection with a project known as the Crotona Park Project. *Id.* ¶ 3. On March 3, 2010, Colonial issued a union bond bearing bond no. CSC-94495 in favor of Local 137, as obligee, in the amount of $100,000. *Id.* ¶ 7. The bond states that "the Principal and Surety are held and firmly bound pursuant to the terms of the [CBA] between Principal [DeRosa Tennis] and Obligees [the Union]." Delaney Aff. Ex. D (hereinafter, the "Union Bond"). It further states, "In the event of a default by the Principal, the Obligees shall notify the Surety via certified mail/return receipt requested of such default within one (1) year of the last act of default[.]" *Id.* The Rider to the Union Bond states, "It is understood and agreed that failure by the obligee to notify the Surety of delinquency more than Thirty (30) days shall void the Surety's obligation under this bond." Delaney Aff. Ex. D, p. 3 (hereinafter, the "Union Bond Rider").

Pursuant to the results of an audit for the period of June 1, 2009 through August 30, 2010, on January 14, 2011, representatives of the Union sent a letter to Colonial Surety notifying that DeRosa Tennis failed to pay fringe benefit contributions in the amount of $203,831.93. Colonial's 56.1 ¶ 10. The letter served to make a demand on Colonial Surety under the Union Bond. Colonial Surety acknowledged receipt of the letter and on January 18, 2011 sent a letter requiring the Union to complete a Proof of Claim form and submit documents to allow Colonial Surety to verify the amount of the claim. Such information was sent to Colonial Surety on January 26, 2011. *Id.* ¶ 11. On June 18, 2012, the Union revised the amount of the claim to

$129,356.61. *Id.* ¶ 18. That revised amount included a payment made by DeRosa Tennis in the amount of $108,405.40 toward the amount due as indicated in the audit. *Id.* ¶ 20(a).

## II.     Legal Standards

### a.   Summary Judgment Standard

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. The rule states in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine dispute or issue[2] of material fact by pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). Courts must "constru[e] the evidence in

---

[2] The 2010 amendment to the Rule retained the summary judgment standard of former subdivision (c), but replaced "issue" with "dispute" because the term "better reflects the focus of a summary judgment determination." Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments. Thus, the terms are interchangeable in this context.

the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact . . . ."), nor is it to determine a witness's credibility, *Anderson*, 477 U.S. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

## III.   Discussion

### a.   Territorial Application of CBA

Colonial argues that the "Territorial Application" provision of the CBA limits Plaintiffs' claims to contributions sought solely for work performed within a certain geographic territory. Article 1 of the CBA, entitled "Territorial Application," states:

> All the counties of Westchester and Putnam and the part of Dutchess County defined by the northern boundary line of the City of Poughkeepsie, then due east to Route 115, then north along Route 115 to Bedell Road, then east along Bedell Road to VanWagner Road, then north along VanWagner Road to Bower Road, then east along Bower Road to Route 44 and along Route 44 east to Route 343, then along Route 343 east to the northern boundary of Town of Dover Plains and east along the northern boundary of Town of Dover Plains to the border line of the State of Connecticut and bordered on the west by the middle of the Hudson River.

CBA Art. 1. Colonial argues that this provision precludes it from covering contributions for jobs performed outside of the stated territory. Plaintiffs argue that the CBA covers all work performed by all of the Union employees of DeRosa Tennis, whether or not performed within the Counties of Westchester, Putnam, or the area of Dutchess described.

"There is no dispute that a surety's obligations are limited to those it undertakes in its bond and that the bond attaches to the principal contract and must be construed in conjunction therewith. . . ." *Varlotta Constr. Corp v. Sette-Juliano Constr. Corp.*, 234 A.D.2d 183, 183 (1st Dep't 1996)). "As courts have done for over a century, we look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 51 (2d Cir. 2004). The Union Bond provides that the parties are bound by the CBA. In interpreting a contract such as the CBA, the "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). "The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement[, and s]ummary judgment is only proper in a contract dispute if the language of the contract is wholly unambiguous." *Trustees of Bricklayers and Allied Craftworkers v. Charles T. Driscoll Masonry Restoration Co.*, 165 F. Supp. 2d 502, 510 (S.D.N.Y. 2001) (internal citations omitted).

There are several provisions of the CBA that are especially pertinent to the resolution of this issue. The most important is the Territorial Application provision, which is the first Article of the CBA. Article II of the CBA, setting forth the "Scope of Employment" dictates that the CBA covers "Heavy Construction work" which is "defined as the Construction of Engineering Structures, Building foundations and walls, to finished grade[.]" CBA Art II. Article III, entitled "Jurisdiction," states, in pertinent part, "The Employer agrees that Local 137 and its branches shall be the exclusive representative of all Employees of the Employer performing work within the recognized jurisdiction of the Union . . . ." CBA Art. 3, s. 1. Other pertinent sections include

Article XXVIII, entitled "Miscellaneous," which states, in pertinent part, "It is further mutually understood and agreed that this Agreement shall apply to all persons covered under this Agreement at the Contractors' permanent and temporary shop, garage, base of operation and job site," CBA Art. XXVIII, s. 3, and Article XXXII, entitled "Double Breasted," which states:

> In order to protect and preserve, for the Employees covered by this Agreement, all work hereto fore performed by them; to protect the benefits to which Employees are entitled under this Agreement; and to prevent any device or subterfuge to avoid the protection and preservation of such work and benefits, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement, *within the geographical area of this Agreement*, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholder) exercises either directly or indirectly any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

CBA Art. XXXII, s. 1 (emphasis added).

When looking at the entire agreement, the Court must take care to "give full meaning and effect to all [of a contract's] provisions." *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206. Following the preamble of the CBA, the first three Articles lay out the "Territorial Application," the "Scope of Employment," and the "Jurisdiction" of the relationship between DeRosa Tennis and Local 137. The essential issue here is the application of the "Territorial Application" provision of the CBA. The two articles immediately following the "Territorial Application" indicate the type of work that is covered by the CBA and the area of responsibility of the Union in its representative capacity. There are other sections of the CBA which provide context for the interpretation of the "Territorial Application" provision. For instance, Article XXXII uses the language "within the geographical area of this Agreement" indicating that there is a limit to the geography of the job sites covered under the CBA. On the other hand, Article XXVIII states that the Agreement applies to all covered employees at every job site. It is also true, as Defendant argues, that the CBA does not include a "traveling contractors clause," which generally applies when employees

are sent to job sites where there is no local agreement and in which case the CBA would cover that work. Plaintiff argues that the defined geographical location in the CBA's territorial application refers to the "exclusive jurisdictional protections provided [by the Union] within that territorial application." The Court agrees with Plaintiffs.

First, the Court does not find any ambiguity in Article 1 of the CBA. Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *Trustees of Bricklayers and Allied Craftworkers*, 165 F. Supp. 2d at 510 (quoting *Compagnie Financiere De Cic et de L'Union Europeenne, Management Invest. Funding Ltd v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000)). Reading the CBA in its entirety and taking the Territorial Application section in context, it cannot be the case that the CBA limits the geographical area in which DeRosa Tennis – and through the Union Bond, Colonial Surety – is required to remit benefits to covered employees for work performed by its employees. Contributions to each of the funds at issue is directly tied to the wages paid to each employee of DeRosa Tennis. The CBA does not limit the geographical area in which DeRosa Tennis operates or was required to pay its Union employees wages in connection with the work performed.

The fact that there is no "traveling contractors clause" in the CBA is not dispositive of this issue. The case cited to by Defendant in its moving brief, *Trustees of the Chicago Plastering Institute Pension Trust v. Cork Plastering Co.*, No. 03 C 6867, 2007 WL 6080197  (N.D. Ill. Aug. 27, 2007), is not applicable to the circumstances here. In that case, the court made a determination as to which local union – among several with which the employer had agreements – the employer was required to make contributions. In the court's findings of fact, it states, "[I]f G & J employees performed plastering work within the geographic territory of Local 5, G & J

was obligated to make contributions to the Local 5 Funds based on that work-irrespective of whether the employee performing the work was a member of Local 5, BAC 56/74, or Local 362/11." *Id*. at *4. However, each of the local unions had reciprocal agreements, which provided that a fund receiving contributions for work performed within the geographic territory by a member of another union would transfer the contribution to the corresponding fund from the worker's union. *Id*. Here, there are no other unions with which DeRosa had agreements. Thus, *Trustees of the Chicago Plastering Institute* bolsters the conclusion that contributions to a union fund to which an employee belongs must be made regardless of the geographical location of the work performed because in that case, contributions were made even though work was performed outside the geographical area of the union. Nor are the additional cases cited by Defendant in its reply brief applicable here. In *Trustees of the Bricklayers and Allied Craftworkers, Local 5 v. Charles Driscoll Masonry Restoration Co.*, 165 F. Supp. 2d 502 (S.D.N.Y. 2001), the employer signed an agreement with the union, Local 5, which contained a traveling contractors clause. That agreement was in connection with a specific job performed within the territorial jurisdiction of that union. The union then sought benefit contributions for all work performed by the employer's employees outside the union's territorial jurisdiction – including for employees who were never represented by the union. The court held that the traveling contractors clause did not obligate the company to pay contributions to the union. Thus, the circumstances of that case do not have bearing on the issue here.

Additionally, the intent of the parties to the CBA is clearly that contributions would be made on each hour worked no matter the location of the job site due to the fact that the amount paid by DeRosa Tennis toward the deficiency found in the audit did not distinguish between the locations of the projects. *See* Russo Aff. Ex. E.

9

Therefore, summary judgment on this issue is inappropriate.

### b.   Notice Provisions of the Bond & Rider

Defendant next argues that the Rider to the Union bond precludes contributions for work performed prior to December 10, 2010, or thirty days prior to the time that Local 137 sent notice of its claim under the Union Bond. The Rider provides, "It is understood and agreed that failure by the obligee to notify the Surety of delinquency more than Thirty (30) days shall void the Surety's obligation under this bond." Union Bond, Rider. The Rider further states, "Nothing herein contained shall vary, alter or extend any of the provisions, conditions or other terms of this bond except as above stated." *Id*. The CBA provides that contributions to the funds are to be made weekly at the same time as wages are paid. CBA Arts. X, s. 1(a), XI, s. 1(a), & Art. XII, s. 1(a). There is also a provision which provides that the Trustees of the funds "may at their discretion, permit the Employer to make monthly contributions" instead of weekly contributions. CBA Art. XVI, s. 4.

Defendant argues that "delinquency" is not an ambiguous term and that the Rider requires notice within 30 days of the contributions becoming due. Plaintiffs argue that the Rider notice provision is ambiguous because there is no point of reference for the start of the 30 day period within which notice was required to be given. The Court agrees with Plaintiffs.

On the issue of default, the Union Bond provides, "In the event of default by the Principal [DeRosa Tennis], the Obligees shall notify the Surety via certified mail/return receipt requested of such default within one (1) year of the last act of default, and provided further that no suit, action or proceedings shall be maintained against the Surety unless same be instituted within one (1) year after the date of expiration or cancellation of this Bond." Union Bond. However, the Rider does not state whether the notice must be made from the *last act* of default or otherwise define the point at which the thirty day notice period begins to run. It is ambiguous because the

notice period may begin to run from the most recent delinquency or from the first delinquency or some other point which is undefined. Although the Union Bond's notice provision states that notice must be made within a certain period of time of the last default, the Rider specifically says that it overrides the Bond on the issue of notice. Therefore, the Court determines that the Rider is ambiguous and therefore, summary judgment is not warranted as there is a material question of fact regarding the application of the notice provision of the rider.

### IV.    Revised Audit

Defendant states that the audit performed by Plaintiffs for the period of September 1, 2010 through December 1, 2010 and produced on April 9, 2014 – after the discovery period had closed – should not be admissible in this action. In Plaintiffs' Second Amended Complaint, it alleged that DeRosa Tennis owed $84,304.80 in contributions for the period of September 1, 2010 through the time the Second Amended Complaint was filed on June 20, 2011. Sec. Amend. Compl. ¶ 26. It demanded an audit to determine a more precise figure. *Id*. ¶¶ 41-45. However, the revised audit was not performed until March 14, 2014.[3] Pl.'s 56.1 ¶ 36. That report was produced to Defendant on April 9, 2014. Delaney Reply Aff. Ex. W. At a conference before this Court on January 24, 2014, it was ordered that any outstanding discovery was to be produced within one week. Docket Minute Entry for Jan. 24, 2014. Thus, when the revised audit was produced, discovery had closed.

---

[3] In Plaintiffs' response to Defendant's 56.1 Statement regarding the period of the audit performed is as follows: "Local 137 Trust Fund's claim was based upon an audit performed for the period June 1, 2009, through August 30, 2010; it was also for the period of September, 2010 through December, 2010." Def.'s 56.1 ¶ 10. It is unclear whether this response refers to the fact that the *claim* included the period of September through December 2010 or that the audit included those dates. It does not seem to be in dispute that the claim included the later months but it is clear, from Plaintiffs' amended complaint, that the audit did *not* include September 2010 through December 2010.

Discovery was initially scheduled to close on May 31, 2012. Docket Minute Entry for Jan. 23, 2012. Through multiple extensions of deadlines, discovery eventually closed at the end of January 2014. Plaintiffs do not provide any justification for the failure to produce the revised audit until after the close of discovery and after Defendant served its moving papers for the instant motion. However, Defendant was clearly on notice that a revised audit was to take place for the period of time in question because it was requested in each version of the complaint. Additionally, there is no question that there was always some amount of contributions due for the months of September through December. Under Rule 37 of the Federal Rules of Civil Procedure, failure to disclose discovery in a timely manner may result in the imposition of sanctions, including precluding the dilatory discovery. Fed. R. Civ. P. 37(c), 37(b)(2)(A). "Preclusion of testimony and dismissal are, to be sure, extreme sanctions, to be deployed only in rare situations." *Cine Forty-Second St. Theater Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1063 (2d Cir. 1979). However, such actions "are necessary to achieve the purpose of Rule 37 as a credible deterrent 'rather than a "paper tiger."'" *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (quoting *Cine*, 602 F.2d at 1063). Rule 37(b)(2)(A) requires that any sanction issued by the district court for failure to comply with a discovery order be "just." Fed. R. Civ. P. 37(b)(2)(A).

Here, due to the delay in providing the revised audit without justification, the Court precludes Plaintiffs from relying on the audit performed for the period of September 2010 through December 2010 and completed on March 14, 2014. Here, as in *Chen v. New Trend Apparel, Inc.*, "[t]here is no dispute that the [party] did not comply with the court-ordered deadline, did not seek its modification, and have offered no explanation, much less a

justification, for their delay." *Chen v. New Trend Apparel, Inc.*, ---F. Supp. 2d.----, No. 11 Civ. 324(GBD)(MHD), 2014 WL 1265916, at *18 (S.D.N.Y. Mar. 27, 2014).

**V.     Conclusion**

Accordingly, the Court DENIES Defendant's motion for partial summary judgment in its entirety. Further, the Court precludes Plaintiffs from relying on the revised audit submitted in connection with Plaintiffs' opposition to Defendant's partial summary judgment motion. The Clerk of the Court is respectfully requested to terminate this motion, Docket No. 48.

The parties are directed to appear before the Court for a pre-trial conference on September 25, 2014 at 11:15 a.m.

Dated: Sept. 11, 2014                                                      SO ORDERED:
       White Plains, New York

                                                                         NELSON S. ROMÁN
                                                                         United States District Judge